CHARLES G. LORING *vs.* ISRAEL THORNDIKE & others.

Un ler a bequest as follows: " I give to my son A. $40,000, of which one half is to be placed
by my executors with the M. H. L. I. Co., in such manner that my said son shall receive
the interest and income thereof during his life, and, at his decease, the principal shall be
paid to his lawful heirs," the heirs of A. take directly as legatees under the will, and not
as his representatives.

The civil act of the free city of Frankfort on the Main, requiring marriages to be solem-
nized in a particular form, does not apply to foreigners temporarily residing there; but a
marriage in that city, before the United States consul, between a citizen of Massachusetts
and a woman not domiciled there is valid.

Under a bequest, in the codicil to a will, of personal property to a person for his use during
life, and at his death to his lawful heirs, the words " lawful heirs " will be construed
according to their common law interpretation, and will not include those who would take
under the statute of distributions, if the bequest is expressed to be in lieu of real estate,
which had been devised to him in the will.

BILL IN EQUITY in the nature of a bill of interpleader, brought
by the surviving executor of and trustee under the will of Israel
Thorndike the elder, against Israel Thorndike the younger, as
one party, and Andreas Thorndike, an infant of tender years
residing in Germany, but represented here by his guardian, as
another party.

The bill set forth that Israel Thorndike the elder, by his will,
proved in 1832, gave and devised to his son Andrew and his
heirs, in addition to various legacies, the following : " All the
debt and claim and demand which I have against George
D'Wolf, formerly of Bristol in the state of Rhode Island, and
now a resident of the island of Cuba ; and all the land and
estate in the island of Cuba which the said George mortgaged
to me to secure my debt due from him ; " that a codicil to said
will contained the following bequest: " I give to my son An-
drew, in lieu and instead of the Cuba estate or plantation, and
debt of George D'Wolf, given to him in my said will, and in
addition to what I have therein given him, besides said estate
or plantation, and debt of George D'Wolf, forty thousand dol-
lars, of which one half, or twenty thousand dollars, is to be
placed by my executors with the Massachusetts Hospital Life
Insurance Company, in such manner that my said son shall

22 *

receive the interest and income thereof during his life, and, at his decease, the principal shall be paid to his lawful heirs ; the other half, or twenty thousand dollars, is to be paid to my said son for his own use and to his own disposal."

The bill further set forth that Andrew died in 1854 ; and thereupon Israel Thorndike the younger, a brother of Andrew, claimed that he, with his brothers and sisters, and the children of such of his brothers and sisters as have died, are the only heirs at law of Andrew, and as such are entitled to receive the said sum of $20,000 ; and that said Israel, claiming to be entitled to one sixth part thereof, has already commenced an action against the plaintiff to recover the same ; that Andreas Thorndike, represented by his guardian, claims the whole of said sum, as son and sole heir at law of Andrew, and has threatened to commence an action against the plaintiff to recover the same ; and that the plaintiff is unable to determine the rights of the parties, in respect to their several claims.   The prayer was that the parties might interplead, and set forth the grounds of their claims, and that the court would pass a decree, directing the plaintiff as to the payment of said sum, and in the performance and execution of his trusts.

At the hearing, before *Shaw*, C. J., the following was the outline of the case stated for the defendant Andreas Thorndike, and of his claim to be the heir at law of said Andrew :

The mother of Andreas was a German woman ; Andrew Thorndike associated with her before marriage ; she had a daughter in 1848, whilst residing at Mayence ; afterwards, in May 1851, Andreas was born of the same mother, Andrew still living with her ; on the fourth day of August, in the same year, Andrew Thorndike and Katharina Bayerl, the mother of the said Andreas, were married at Frankfort on the Main before the United States consul ; after the marriage, Andrew Thorndike, being here in the state of Massachusetts, made and executed a will, in due form of law, by which he recognized and acknowledged the said Andreas to be his legitimate son.

Chief Justice Shaw thereupon made the following report of his disposition of the case :

" Finding that the questions to be considered and decided were almost exclusively questions of law ; (for, although rules of foreign law are technically regarded as facts, yet, when the evidence on which they depend is put in, they are discussed and regarded· mostly as questions of law ;) and finding that the evidence is all, or nearly all, documentary and reduced to writing, viz., the depositions of the mother and grandmother of the said Andreas, as to the facts and circumstances of the alleged marriage ; certificates of marriage, birth and baptism ; consular certificates, and depositions of several doctors of the civil law ; I proposed, and, with the consent of the parties, determined without reading the evidence, to enter a *pro forma* judgment, dismissing the bill, from which the plaintiff would appeal, and thus bring the whole case upon all the evidence before the full court ; that, upon the law and the evidence before them, they may enter such judgment as upon the law and equity of the case the rights of the parties may in their judgment require."

Afterwards, Katharina Thorndike and her daughter Anna E. Thorndike were added as parties, and appeared, the former by her attorney and counsel, and the latter by her guardian *ad litem ;* and the case was reserved, by *Bigelow,* C. J., for the determination of the whole court, to be heard on the report of the late chief justice, and the evidence thereto annexed.

The will of Andrew Thorndike was executed in Boston on the 27th of August 1853, and contained a full recognition of Andreas as his son ; but contained no reference to Anna. A translation of those portions of the civil act of the free city of Frankfort respecting marriage, which are material to the questions determined in this case, is given in the margin.* The other material facts are stated in the opinion.

---

* We, the Burgomasters and Council of the Free City of Frankfort, do, in pursuance of a constitutional resolution by the legislative assembly of Nov. 1, 1850, hereby order as follows :

1. The law in question regarding civil marriage shall take effect on the first day of May 1851.

2. What is requisite for obtaining the publication of banns, as contained in the common civil and statute law, is the same with respect to civil marriage, for all persons alike, of whatever religious creed.

*F. C. Loring,* for the plaintiff.

*J. L. English & S. L. Thorndike,* for Israel Thorndike, and

3. Difference of religion is no hindrance to a civil marriage.

4. A dispensation from the publication of banns and from obstacles to mar riage rests solely with the senate.

5. Parties to be married, domiciliated in the city, as also those in the rural dis-tricts, have, either personally or through others sufficiently authorized, to apply at the city registrar's office for the publication of banns. When the necessary documents have been produced, the publication of banns shall be ordered, and a copy of such order made out.

6. The publication of the banns shall take place where the parties to be mar-ried are domiciliated. The registrar shall cause publication of the banns of those residing within the city to be made in the official public paper next appearing. The banns of such as are residing in the rural districts shall, when ordered, be affixed at the parish office by the registrar of that parish.

7. If the parties to be married do not both reside at the same place, the banns shall be published in each of their respective places of domicil, according to the forms there existing.

8. Protestation against the consummation of a marriage is to be preferred at the city court, section I; which, according to circumstances, shall decree an inhi-bition. Prohibition by the court shall be entered without waiting for a legal de-cision.

11. After the parties to be married shall, before the registrar of their domicil, have publicly, in the presence of at least two male witnesses who have attained their majority, pronounced their intention to be married to each other, the regis-trar shall declare the marriage concluded in the name of the law.

12. The civil validity of a marriage to be concluded depends solely on the execution of the civil act. The religious solemnization of a marriage shall not take place till after the conclusion of the civil act.

13. The solemnization of a marriage in a foreign country of a party, a subject of this state, shall be entered only either when permission has been previously granted by the senate and the banns have been published, or a dispensation pro-cured, or if the senate sanction it subsequently. The exterior form of such a marriage shall be judged of according to the laws of the place where it has been concluded.

14. The complete entry of a marriage contains, 1. Name and surname of the parties married; 2. Their rank and profession; 3. Their birthdays, and where born; 4. In the case of widowed or divorced persons, the name of former spouse, and day of marriage — or, if divorced, date when; 5. Name and surname, as also rank or profession, of the respective parents; 6. That the marriage has been concluded, adding names of witnesses — or, if married abroad, stating circum-stances, place and date

the representatives of Augustus, Charles and Edward Thorndike, deceased. The validity of a marriage everywhere depends on its being solemnized in the manner prescribed by law, as to matters of substance. Bishop on Mar. & Div. §§ 31, 42. *Milford* v. *Worcester*, 7 Mass. 48. *The Queen* v. *Millis*, 10 Cl. & Fin. 655. *Catherwood* v. *Caslon*, 13 M. & W. 261. The general rule is, that a marriage not valid by the local law of the place where it is solemnized is not valid anywhere. Story Confl. Laws, §§ 105, 113, and cases cited. Bishop on Mar. & Div. § 132, and cases cited. The present case is within none of the exceptions to this general rule. Bishop on Mar. & Div. § 133 *& seq.* No marriage according to the law of Frankfort is proved in this case. If these parties could not have been married in Frankfort, according to the *lex loci*, either because that law did not apply to foreigners, or because they could not comply with its requisitions, or by reason of any other insuperable obstacle, then the *lex domicilii* applies. Story Confl. Laws, §§ 118, 119. *Ruding* v. *Smith*, 2 Hagg. Con. 371. No marriage according to the law of Massachusetts is proved in this case. There is no such thing as a United States law of marriage. American consuls are not authorized to solemnize marriages. 7 Opinions of Attorneys General, 78, 342. *Kent* v. *Burgess*, 11 Sim. 361. This marriage did not accord with the law of the domicil of the woman.

*A. B. Merrill*, for Andreas Thorndike.

*H. W. Paine & A. C. Clark*, for Anna L. Thorndike.

MERRICK, J. By a codicil to the last will of Israel Thorndike, he gave to his son Andrew $40,000, of which one half was to be paid to him for his own use and at his own disposal, and the other half, or $20,000, was to be placed by the executors of the will with the Massachusetts Hospital Life Insurance Company, in such manner and upon such terms that the said Andrew should receive the interest and income thereof during his life, and that at his decease the principal should be paid to his lawful heirs. This, therefore, is in effect a bequest to the heirs of Andrew, subject to his right to have and enjoy during his life all the income to be derived from the fund or principal sum thus

bequeathed; so that they who in the end should become entitled to such fund would take it as legatees directly under the will, and not as heirs at law of the testator, or by inheritance and descent from the legatee to whom the income thereof is given for life.

Andrew Thorndike having deceased, it is now necessary to determine the question in controversy between the parties to the bill, To whom, as his lawful heirs, shall this sum of $20,000 be paid? In the first place, it is claimed by Israel Thorndike, son of the testator, and by the representatives of some of his brothers, that they are such lawful heirs, and so entitled to receive the money which has now become payable. But this claim is resisted by the respondents Katharina Thorndike and her children Andreas and Anna Thorndike, who respectively contend that the former, as the wife and now the widow, and the latter, as the legitimate children of the said Andrew, are his lawful heirs, and entitled to the legacy of the principal sum, of which the use and enjoyment was given to him for life. They assert that a lawful marriage was contracted between said Andrew and Katharina on the 4th of August 1851; but they admit that said Andreas and Anna were born before that time, so that at their birth they were both illegitimate.

The evidence in the case clearly and unequivocally shows that from and after the 4th of August, the time of their alleged marriage, Andrew and Katharina Thorndike lived and cohabited together, and were known, treated and recognized by all their friends and acquaintances as husband and wife, until his death, which occurred on the 21st of July 1854. It also satisfactorily shows that he was the father of said Andreas and Anna, and that after the time of the alleged marriage, and while he lived and cohabited with the said Katharina as his wife, he recognized, acknowledged and treated them as his children. The evidence upon this subject is less full and complete in relation to Anna than to Andreas. But this may be accounted for by the consideration that, at the time when the first depositions were taken in the case, she had not been made a party to the bill, and her rights were not then the subject of inquiry or

investigation. But her paternity, and the acknowledgment of her as his child by said Andrew, sufficiently appear from the testimony of Katharina Thorndike and of her mother, Anna Kerbeneck. The latter testifies that her daughter never bore any child before her cohabitation with Mr. Thorndike; and Mrs. Thorndike distinctly states that he was the father of Anna, and " always acknowledged himself to be so by his behavior, in conversations, and in letters written by him." Her testimony is not contradicted or brought into doubt by any fact or circumstance shown in evidence, and therefore ought to be regarded as satisfactory proof of the facts stated by her.

This acknowledgment by said Andrew is very material, because by Rev. Sts. *c.* 61, § 4, it is enacted that " when, after the birth of an illegitimate child, his parents shall intermarry, and his father shall, after the marriage, acknowledge him as his child, such child shall be considered as legitimate to all intents and purposes, except that he shall not be allowed to claim, as representing either of his parents, any part of the estate of any of their kindred, either lineal or collateral." The single exception here provided for is as to the right of taking by inheritance as representative of the parents any part of the estate of any of their kindred, which, if they had been living, would have descended to them. In all other respects and for all other purposes children born before the marriage of the parents, and subsequently during its continuance acknowledged and recognized by the father as his, are to be deemed to be legitimate and are made and constituted his lawful heirs. Applying the provisions of this statute to the case of Andreas and Anna E. Thorndike, who claim only as executory legatees under the will of Israel Thorndike, and not by or in right of representation of their father, anything which would or could have come or descended to him, if living, from any of his kindred, they are, by reason of having been openly and constantly acknowledged and declared by him during the time while he lived and cohabited with said Katharina as his wife, to be deemed, recognized and treated as his lawful heirs, if there was in fact a legal marriage duly contracted between him and her.

In reference to this question, it appears from the uncontested

Loring *v.* Thorndike & others.

evidence in the case that on the 4th of August 1851 Mr. Thorn-dike, who was a citizen of Massachusetts, and Katharina Bay-erl of Mayence, in the Grand Duchy of Hesse-Darmstadt, were temporarily residing at the free city of Frankfort, neither of them then having or ever having had any domicil there, and were desirous of being lawfully married ; that, being foreigners and unacquainted with the local law, they applied for informa-tion " to magistrates, counsel and other persons skilful in the law," and were advised that " the proper mode of entering into the marriage relation was the solemnization of it before the con-sul of the United States at Frankfort on the Main ; " that Mr. Schwendler, the consul, gave them the same advice ; that they thereupon appeared before him for the purpose of being married, and there signed their marriage agreement, which was attested in the presence of two subscribing witnesses, and was then duly entered in the consular register ; and duplicate copies of it were delivered at their request to each of the parties.* The consul then declared that their marriage was legal and valid. And in addition to this he informed them that he had married many American gentlemen to American or German ladies ; and that these marriages, solemnized and registered by the consul, as was

---

* The following is a copy of this agreement : " We, the undersigned, An-drew Thorndike, of the city of Boston, county of Suffolk, and state of Massa-chusetts, aged sixty years, and Katharina Bayerl, of the city of Mayence, in the grand duchy of Hesse, aged twenty-six years, do hereby declare, that we have truly and solemnly promised to marry each other, and that we now both wish to enter in the state of marriage ; and that we desire, in conformity with the laws of the United States of America, that the civil act of our union in marriage may be executed in the usual form before Ernest Schwendler, Esq., the duly ap-pointed consul of the United States of America for this free city. We there· fore confirm by these presents our mutual consent to the desired conjugal union, and do sincerely and solemnly promise scrupulously to fulfil the duties of hus· band and wife, by virtue of our respective seals and signatures.

" Frankfort on the Main, Aug. 4, 1851.

(Seal)        Andrew Thorndike.
(Seal)        Katharina Bayerl."

Sealed and signed in presence of
    G. Lindheimer,
    I. Eckhardt,
       *As witnesses* "

done in this case, had always been regarded by the Frankfort and German authorities as valid. In the full belief that they were thus lawfully married, they thenceforward lived together as husband and wife, during the life of Mr. Thorndike.

Here then there was in fact a contract of marriage between the parties, and a celebration of their nuptials by the observance of a form and ceremony which they were advised and believed made their marriage binding, obligatory and complete. But its validity is now denied, upon the ground that the civil validity of a marriage contracted, entered into or celebrated at the free city of Frankfort, depends wholly upon the civil act upon that subject there enacted. And these parties, not having conformed to the provisions and requirements of that act, it is contended that they were never lawfully married.

The difficulty in determining this question arises from the conflict of evidence in relation to the question, what was the local law of the place where they were married? We have a copy of the civil act of the free city of Frankfort annexed to the depositions of the witnesses who have been examined upon the subject, all of whom are counsellors at law and residents of that city. Dr. Von Guaita and Dr. Hoffman, witnesses on one side, testify that the civil act, which contains the provisions of law with regard to the form in which a marriage is to be entered into there, applies as well to foreigners as to citizens of Frankfort; and that as the civil validity of a marriage depends solely on the execution of that act or the due observance of its provisions, the ceremony and proceedings which took place before the American consul, as before stated, did not constitute a valid marriage. But on the contrary Dr. Braunfels and Dr. Voigt testify with equal confidence that the civil act of Frankfort is inapplicable to foreigners; that marriages between such persons which are entered into at that place according to the prescriptions of the common law are valid and obligatory; and that, under the circumstances before stated, the marriage between Mr. Thorndike and Katharina Bayerl, which took place in the presence and with the sanction of the consul of the United States, was legal and valid.

In this positive and irreconcilable conflict of testimony, we are under the necessity of considering the reasons assigned by the witnesses for the opinions they express, and of comparing their opinions with the language and terms in which the civil act is expressed.

It is noticeable, in the first place, that Drs. Von Guaita and Hoffman deduce their conclusions entirely from the particular provision in the statute of Frankfort, denominated the civil act, which, after prescribing the course of proceedings to be had to constitute a marriage there, declares that the validity of the marriage shall depend upon the execution of that act. But they fail to point out or indicate any part of that act which, either in direct terms or by necessary or reasonable implication, makes it applicable to foreigners temporarily resident there, who seek to contract a marriage and to be lawfully married at Frankfort; nor do they refer to any judicial interpretation of its provisions to that effect, or to any legal authority in support of their opinion. But Drs. Braunfels and Voigt testify that they have known many cases, to some of which they particularly refer, in which it has been determined by German tribunals that the said civil act does not apply to or embrace the cases of foreigners entering into that relation in that city. And that this is a reasonable and proper conclusion would seem fairly, perhaps it might be said necessarily, to result from several provisions of that act. It is upon this question very significant that the civil act makes very precise and exact provisions as to the manner in which citizens of Frankfort may conclude a valid marriage abroad, while it does not in any word or phrase allude to the way or manner in which foreigners may conclude a lawful marriage there. But a more important and what perhaps ought to be regarded as a decisive consideration, results from the provisions concerning the publication of banns. These are most expressly required to be published in each of the places where the parties proposing and intending to be married are respectively domiciliated; in the city in one, in the rural districts in another prescribed form and manner. And this prior publication of banns is made one of the prerequisites essential to the validity

of the marriage. Such a provision, it would seem obvious, could not have been intended to have any reference to foreigners who had not in some manner acquired a domicil there, because it ordains the observance of a regulation with which it would be impossible for such persons to comply, and to which it would therefore be absurd to require them to conform. This provision, therefore, under an interpretation which appears to be just and reasonable, has a very direct and strong tendency to show that the civil act is only applicable to and obligatory upon citizens, and persons who by choice or long extended residence have obtained a domicil in the state where the law is enacted.

In support of this conclusion, and as tending also to prove the validity of the marriage of Mr. Thorndike and Miss Bayerl, Dr. Braunfels testifies that the American consul " has always and at any time been in the habit of solemnizing such marriages ; " that he married a great number of couples where each of the parties, or the husband, was a citizen of the United States; that this has been done openly, with the full knowledge of the Frankfort authorities, who have never in any manner objected or interfered to prevent it; and he adds : " I have known of some cases, (for instance, the case of Mr. Pfeil,) where Frankfort ladies, intending to marry American gentlemen, have been released by the senate from their citizenship expressly ' that they might enter into civil marriage before their consul.' " Certainly such a proceeding must be regarded as a very clear and authoritative declaration that the provisions of the civil act of marriage are not applicable to or obligatory upon foreigners, and that a marriage of such persons before the consul of their country, according to the prescription of the common law, would be recognized as legal and valid at Frankfort. And this conclusion seems to be fully warranted by the decisions in the cases referred to by the witnesses, in which the marriage of foreigners by Protestant curates at Frankfort, without conforming to the requirements of the law of the 19th November 1850 — the civil act before referred to — has been acknowledged and upheld as valid by German judicial tribunals.

The testimony of Drs Braunfels and Voigt, that the marriage

of Mr. Thorndike and Miss Bayerl by and before Mr. Schwend-
ler, the consul of the United States, in the form and manner in
which it was there contracted and entered into by the parties, is
valid in Frankfort, as having been duly contracted according to
the prescriptions of that portion of the common law which had not
been there abrogated or repealed, is very strongly corroborated
by the decisions to which they refer ; and especially by the pro-
ceedings of the public authorities in releasing females from their
citizenship in order that they might, and to enable them to, enter
into a valid marriage there before the consul of the country of
their intended husbands. And when it is considered that foreign
consuls, and this consul in particular, did frequently and notori-
ously, for and in behalf of parties similarly situated, officially
perform, and allow and permit to be performed in his presence,
a form and ceremony with an intent and design thereby to
marry the parties, and to make their marriage complete and
legal; and that when Mr. Thorndike was carefully inquiring of
proper and competent persons to obtain accurate information on
the subject, he found it to be the concurrent opinion and advice
of the consul, and of " magistrates, counsel and persons skilful
in the law," that the proper mode and form of marriage by him
as a foreigner was the solemnization of it before the consul of
his country, and that such proceeding would make the marriage
legal, we think that there is a clear preponderance of evidence
that the statements of Drs. Braunfels and Voigt are to be relied
upon, and consequently that the lawfulness and validity of the
marriage of Mr. Thorndike and Miss Bayerl are satisfactorily
proved and established. The circumstances which have been
shown, and as to which there is no dispute and can be no doubt,
concerning the cohabitation of these parties as husband and
wife, their constant and mutual recognition of the subsistence
of that relation, and their care and nurture of children as their
common offspring, would be quite sufficient, under the provis-
ions of our own statute, in the absence of evidence as to the
particular form and manner in which it was contracted or solem-
nized, to prove a valid and legal marriage. Gen. Sts. *c.* 106,
§ 22. And it would certainly be unreasonable and unjust to

withhold from our own citizens married in foreign countries the benefit of the presumptions resulting from the provisions of our own statutes. But it is unnecessary to urge or to rely upon this consideration, since upon the whole evidence before us there appears to be a clear preponderance of proof that Mr. and Mrs. Thorndike were lawfully married at Frankfort, and that their marriage would, in view of the proceedings and ceremonies attending it, be there recognized as valid by the public authorities and judicial tribunals. This being so, their marriage is, upon the well established principles of the common and international law, to be regarded and treated as valid and obligatory in the countries where the parties respectively had their domicil. Bishop on Mar. & Div. § 125.

Upon the broader and more difficult question, which has been raised and elaborately argued by the counsel of the parties, whether, as a contract *per verba in presenti*, followed by cohabitation as husband and wife, the proceedings which occurred in the presence and with the sanction of the consul of the United States did not constitute a legal and valid marriage under and by force of the principles of the common law, the authorities are, according to the views expressed by the eminent judges by whom the whole subject was most laboriously examined and discussed in the case of *The Queen* v. *Millis*, 10 Cl. & Fin. 534, remarkably variant and conflicting. The conclusion to which we have arrived upon the evidence in the case as to the law of the place where the marriage in form took place, makes it unnecessary to extend our inquiries to the latter question, or to express any opinion concerning it.

Where personal estate is bequeathed to a person for life, and at his decease to his " heirs " or " lawful heirs," it is a settled rule of construction that the word " heirs " shall be interpreted to mean either those persons who are strictly heirs by the common law, or those who are next of kin and take under the statute of distributions, according to the intention of the testator, if his intention relative thereto has been manifested in his will. 1 Roper on Leg. (2d Amer. ed.) 89. That rule is applicable to and must control the decision in the present case, because there is found to

23 *

be in the will of Mr. Thorndike a clear indication of his purpose and intention. The $40,000, of which one moiety is bequeathed at the decease of his son Andrew to his lawful heirs, is given in the codicil, and is there expressly declared to be as a substitution for and in lieu of the " Cuba Estate," which had been devised to him in the will. Consequently it must have been the intention of the testator that the same person should take the moiety of the $40,000 at the decease of Andrew, who would have taken the Cuba estate if the devise of that estate had not been revoked by the bequest substituted for it. And that, being real estate, would have been construed to be a devise to the heirs proper; and the bequest of the personal property must, according to this indication of the intention of the testator, be held to have the same destination, and to be a bequest to the same persons. It is, therefore, a necessary consequence from this conclusion that the said Andreas and Anna are entitled as the heirs at law of said Andrew, in equal shares, to the whole of said sum of $20,000, with the accumulations thereon now in the hands of the executor, and that their mother, the said Katharina, is not entitled as next of kin to any part thereof.

The costs of the plaintiff, to be taxed under the direction of the court, as between client and solicitor, are to be paid out of the money now remaining to be distributed, and no further costs are to be taxed or recovered by either of the other parties to the bill.